UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Terrencio Elder,

    Plaintiff,

v.

Commissioner of Social Security,

    Defendant.

18-CV-1196
DECISION & ORDER

On October 29, 2018, the plaintiff, Terrencio Elder, brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled. Docket Item 1. On April 29, 2019, Elder moved for judgment on the pleadings, Docket Item 10, and on July 26, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 16.

For the reasons stated below, this Court grants Elder's motion in part and denies the Commissioner's cross-motion.

## BACKGROUND

### I. PROCEDURAL HISTORY

On December 30, 2014, Elder applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[1] Docket Item 9 at 207-43. He claimed that he

---

[1] One category of persons eligible for DIB includes any adult with a disability who, based on his quarters of qualifying work, meets the Act's insured-status

had been disabled since November 25, 2014, due to a corneal transplant and "strong[ ] visual[ ] impairment [in] both eyes." *Id.* at 211.

On March 20, 2015, Elder received notice that his application was denied because he was not disabled under the Act. *Id.* at 110. He requested a hearing before an administrative law judge ("ALJ"), *id.* at 120, which was held on May 15, 2017, *id.* at 42-84. The ALJ then issued a decision on January 3, 2018, confirming the finding that Elder was not disabled. *Id.* at 21-36. Elder appealed the ALJ's decision, but his appeal was denied, and the decision then became final. *Id.* at 5-7.

## II. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Elder's claim. Elder was examined by several different providers, but the opinions of Malti Patel, M.D.; Bela Ajtai, M.D./Ph.D.; and Hongbiao Liu, M.D., are of most significance to the claim of disability here.

### A. Malti Patel, M.D.

On February 15, 2016, Dr. Patel, a neurologist, completed an employability assessment and disability screening form for the Niagara County Department of Social Services. Docket Item 9 at 422-23. She noted that she had treated Elder since May 2015 and diagnosed multiple sclerosis ("MS") and headaches. *Id.* Dr. Patel opined that Elder was "[m]oderately [l]imited" visually due to a recent corneal transplant; was

---

requirements. *See* 42 U.S.C. § 423(c); *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need. 42 U.S.C. § 1382(a). A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs. *See* 20 C.F.R §§ 404.1520(a)(2) (concerning DIB); 416.920(a)(2) (concerning SSI).

2

"[m]oderately [l]imited" in understanding and remembering instructions, carrying out instructions, maintaining attention/concentration, and working at a consistent pace; but had no limitations in making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior, and maintaining basic standards of personal hygiene and grooming. *Id.* at 423. Although Dr. Patel did not classify Elder's impairments as "permanent," she did believe that his limitations would last for more than twelve months because his MS was "a lifelong disease." *Id.* Based on these limitations, Dr. Patel concluded that Elder should "be on 100% short term disability." *Id.*

### B. Bela Ajtai, M.D./Ph.D.

On May 28, 2015, Dr. Ajtai, a neurologist at the Dent Neurologic Institute, completed an informal disability statement in which he opined that Elder, who was "under [Dr. Ajtai's] care," was suffering from "posttraumatic headaches, cognitive difficulties, insomnia, back pain and lower extremity pain." *Id.* at 348. Dr. Ajtai found that "[Elder's] cognitive limitations include[d] difficulty with short-term memory and sustained concentration," and he concluded that Elder was "75%" disabled as a result of his impairments. *Id.*

### C. Hongbiao Liu, M.D.

On September 18, 2015, Dr. Liu, an internist, completed a consultative internal medicine examination of Elder. *Id.* at 410-14. Dr. Liu noted Elder's history of MS and abnormal liver function and diagnosed bilateral vision impairment, sleep apnea, recent memory impairment, and bilateral lower leg pain. *Id.* at 414. Dr. Liu specifically observed that Elder's memory impairment interfered with his ability to pay his bills on

3

time and that Elder could remember neither what he ate for breakfast the morning of the examination nor when he had stopped working. *Id.* at 410, 414.

## III. THE ALJ'S DECISION

In denying Elder's application, the ALJ evaluated Elder's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R §§ 404.1520(a)(2) (concerning DIB); 416.920(a)(2) (concerning SSI). At the first step, the ALJ determines whether the claimant is currently engaged in substantial gainful employment. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. §§ 404.1520(a)(4); 416.920(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(i). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. §§ 404.1520(a)(4); 416.920(a)(4).

At step three, the ALJ determines whether any severe impairment or combination of impairments meets or equals an impairment listed in the regulations. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that no severe impairment or combination of impairments meets or equals any in the regulations, the ALJ proceeds to step four. §§ 404.1520(a)(4); 416.920(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e); 416.920(a)(4)(iv); 416.920(d)-(e). The RFC is a holistic assessment of the claimant—addressing both

4

severe and non-severe medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. See §§ 404.1545; 416.945

After determining the claimant's RFC, the ALJ completes step four. §§ 404.1520(e); 416.920(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. §§ 404.1520(f); 416.920(f). But if the claimant cannot, the ALJ proceeds to step five. §§ 404.1520(a)(4)(iv); 404.1520(f); 416.920(a)(4)(iv); 416.920(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ began by determining that Elder had not engaged in substantial gainful employment since the alleged onset date. Docket Item 9 at 24. The ALJ then found that Elder had the following severe impairments: "bilateral keratoconus . . . ; bilateral cataracts . . . ; multiple sclerosis; and migraines/chronic headaches." Id. The ALJ found that Elder did not have a severe limitation in the area of mental functioning because he had only "mild limitation[s]" in understanding, remembering, and applying information; interacting appropriately with others; concentrating, persisting, and maintaining pace; and caring for himself. Id. at 25-26.

5

At step three, the ALJ concluded that Elder "[did] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 26. The ALJ specifically found that Elder did not meet the requirements of listing 2.02 (loss of central visual acuity), listing 2.03 (contraction of the visual fields in the better eye), listing 2.04 (loss of visual efficiency), or listing 11.09 (multiple sclerosis). *Id.*

At step four, the ALJ determined that Elder had the following RFC:

> [Elder] could perform light work . . . with the following limitations. [He] [could] occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or ramps, but he [could] never climb ladders, ropes, or scaffolds. [He could] work in an environment with no exposure to extreme heat or to hazards, such as[ ] unprotected heights or moving machinery[,] and with no more than a moderate noise level, such as[ ] that found in a grocery store or department store. Further, [he could] understand, remember, and carry out simple, routine, repetitive tasks with no more than an average of five minutes off-task per hour in addition to customary work breaks. He [could] perform work that does not require fine depth perception (*i.e.*, within arm's length), does not require more than rare (meaning 1 to 5 percent of the workday) reading or using a computer, and does not require operating a motor vehicle as an intrinsic part of the job.

*Id.* at 27. In determining this RFC, the ALJ gave "little weight" to the opinion of the consultant, Dr. Liu, because "[Elder's] presentation was quite different when he attended the consultative examination . . . in connection with his application [for disability benefits] than at examinations by his treating sources." *Id.* at 32. The ALJ gave "greater weight to [the opinion of Dr. Ajtai] than to the opinion of Dr. Liu." *Id.* And, as more fully detailed below, the ALJ gave substantial weight to some of Dr. Patel's opinions but less weight to others. *Id.* at 33-34.

At step four, the ALJ found that Elder was unable to perform any of his past relevant work. *Id.* at 14. At step five, the ALJ found that "[c]onsidering [Elder's] age,

6

education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that [he] could perform." *Id.* at 34. In reaching this conclusion, the ALJ relied on the testimony of a vocational expert that Elder could find work as a housekeeping cleaner, marker, or cashier. *Id.* at 35. Therefore, the ALJ concluded, Elder was not disabled. *Id.*

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

7

**DISCUSSION**

**I.     ALLEGATIONS**

Elder argues that the ALJ erred by not following the procedural mandates of the treating-physician rule before assigning less-than-controlling weight to the opinion of Dr. Patel. Docket Item 10-1 at 4-6. Consequently, Elder argues, the ALJ's mental RFC finding—specifically with respect to Elder's ability to maintain focus and attention—is not supported by substantial evidence. *Id.* at 5-6. This Court agrees.

**II.    ANALYSIS**

When determining a claimant's RFC, an ALJ must evaluate every medical opinion received. 20 C.F.R. § 416.927(c). But an ALJ generally should give greater weight to the medical opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with the claimant—because those medical professionals are in the best positions to provide "detailed, longitudinal picture[s] of [the claimant's] medical impairments." *See* 20 C.F.R. § 404.1527(a)(2), (c)(2); *see also Genier v. Astrue*, 298 Fed. App'x 105, 108 (2d Cir. 2008) (summary order). In fact, a treating physician's opinion is entitled to controlling weight so long as it is "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).

Before an ALJ may give less-than-controlling weight to a treating source's opinion, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3)

8

the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quotations and alterations omitted). These are the so-called "*Burgess* factors" from *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight" to a treating source opinion "is a procedural error." *Id.* at 96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

Here, the ALJ "[gave] substantial weight to Dr. Patel's suggestion that [Elder] ha[d] no limitations in making simple decision[s], interacting appropriately with others, maintaining appropriate behavior, and maintaining basic standards of personal hygiene." Docket Item 9 at 33-34 (citation omitted). The ALJ also "[gave] substantial weight to Dr. Patel's suggestion that [Elder] ha[d] moderate limitations in understanding, remembering, and carrying out instructions and functioning in a work setting at a consistent pace to the extent that [this suggestion] indicate[d] that [Elder was] limited to simple, routine, repetitive instructions and tasks." *Id.* (citations omitted). But "to the extent that Dr. Patel's opinion could be understood to suggest greater limitations," the ALJ rejected it as "inconsistent with the results of [other] examinations . . . and the results of the subsequent neuropsychological testing showing only mild cognitive impairment." *Id.* And the RFC reflected that evaluation. *See id.* at 27 ("[Elder] could . . . understand, remember, and carry out simple, routine, repetitive tasks with no more than an average of five minutes off-task per hour in addition to customary work breaks . . . [and] rare[ly] (meaning 1 to 5 percent of the workday) read[ ] or us[e] a computer.").

9

In making that evaluation, the ALJ did not comply with the procedural mandates of the treating-physician rule. In particular, the ALJ did not explicitly consider the first *Burgess* factor: Dr. Patel had treated Elder for nearly a year and therefore likely had "a detailed, longitudinal picture of [Elder's] medical impairments," *see* 20 C.F.R. § 404.1527(a)(2), (c)(2), but the ALJ did not address the persuasive impact of that extensive treatment history. Nor did the ALJ explicitly consider the fourth *Burgess* factor: Dr. Patel is a neurologist, whose opinion regarding Elder's mental functioning therefore might be accorded greater weight than that of a generalist, but the ALJ was silent about that as well.

"Because the ALJ procedurally erred, the question becomes whether 'a searching review of the record assures [this Court] that the substance of the [treating-physician] rule was not traversed'—*i.e.*, whether the record otherwise provides 'good reasons' for assigning 'little weight'" to some of Dr. Patel's opinions. *See Estrella*, 925 F.3d at 96 (alterations omitted) (quoting *Halloran*, 362 F.3d at 32); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion"). The Court finds no such assurance here.

The ALJ determined that Elder "could . . . understand, remember, and carry out simple, routine, repetitive tasks" and that he would be off task for "no more than an average of five minutes . . . per hour." Docket Item 9 at 27. In contrast, Dr. Patel concluded that Elder was moderately limited in understanding, remembering, and carrying out instructions, as well as in maintaining attention and concentration and in working at a consistent pace. *Id.* at 423. Although the ALJ accorded "substantial

weight" to these "suggestion[s]," she did so "only to the extent that [they] indicate[d] that [Elder was] limited to simple, routine, repetitive instructions and tasks," as a finding of "greater limitations" would be "inconsistent" with other evidence in the record. *Id.* at 33-34. In other words, the ALJ effectively rejected any portions of Elder's treating physician's opinion that did not match her ultimate RFC determination. But this Court does not identify any "good reasons" in the record for so limiting Dr. Patel's opinion. On the contrary, there are good reasons to credit that opinion entirely.

For example, multiple treatment notes indicate that Elder's attention and concentration were deteriorating in the period leading up to the ALJ's decision, possibly related to the growth of new lesions on his brain that were "consistent with [the] progression [of his MS]." *See id.* at 470.[2] Moreover, both Drs. Ajtai and Liu noted memory impairment and difficulties concentrating in their evaluations. *See id.* at 348, 410, 414. And Elder himself testified that he could not work because of "[m]emory loss" and because "[he could not] concentrate" and "[lost] focus" a lot. *Id.* at 59.

What is more, nothing in the record supports the ALJ's specific mental RFC determination that Elder would be off task for no more than "five minutes . . . per hour." *Id.* at 27. Specific RFC assessments must be based on evidence in the record, not on an "ALJ's own surmise." *Cosnyka v. Colvin*, 576 Fed. App'x 43, 46 (2d Cir. 2014) (summary order) (remanding where ALJ "translated" medical evidence suggesting that

---

[2] *See also, e.g.*, *id.* at 636 (treatment note from August 2017 noting "decreased attention and concentration" and that remote and recent memory were only "conversationally intact"); *see also id.* at 470, 475, 632, 636 (similar, from January 2017 to October 2017); *cf., e.g.*, *id.* at 308, 323, 352, 356, 365, 396, 399, 402, 423, 439, 458, 529, 536 (earlier treatment notes, from March 2010 to December 2016, indicating that Elder was alert and oriented with adequate or normal concentration and attention, intact recent and remote memory, good fund of knowledge, and intact cognition).

11

the claimant would be off task "for ten percent of the workday" into a determination that the claimant would be off task "six minutes out of every hour" because "[t]here [was] no evidence in the record to the effect that [the claimant] would be able to perform sedentary work if he could take a six-minute break every hour, rather than some other duration and frequency amounting to ten percent of the workday").[3] Without "some explanation" from the ALJ "as to the tether between [the] RFC and the non-stale medical opinions or statements from [the claimant], the RFC [is] based upon [the ALJ's] lay analysis of [the claimant's] limitations, which is not permitted and requires remand." *Jordan v. Berryhill*, 2018 WL 5993366, at *3 (W.D.N.Y. Nov. 15, 2018)).

Here, Dr. Patel, the only medical source who completed a mental functioning assessment of Elder, did not find that Elder would be off task for no more than "five minutes . . . per hour," Docket Item 9 at 27. Nor do any other treatment records indicate this limitation (or any limitation with respect to the amount of time that Elder would be on or off task). Rather, Dr. Patel noted more generally that Elder had difficulty maintaining

---

[3] *See also Tomicki v. Berryhill*, 2018 WL 703118, at *5 (W.D.N.Y. Jan. 11, 2018) ("[T]he record does not support the ALJ's conclusion that [the claimant] need[ed] to briefly switch between sitting and standing only every thirty minutes. . . . Moreover, there is evidence in the record indicating that [the claimant] need[ed] to change positions every few minutes, not every thirty minutes."); *cf., e.g., Palistrant v. Comm'r of Soc. Sec.*, 2018 WL 4681622 (W.D.N.Y. Sep. 28, 2018) (holding that the claimant's testimony that he had to alternate between sitting and standing every 20-30 minutes as well as general treatment notes about sitting and standing limitations supported RFC determination that the claimant could alternate between sitting and standing every half hour); *Bryant v. Berryhill*, 2017 WL 2334890, at *4 (W.D.N.Y. May 30, 2017) (holding that "several refences in the record," including the claimant's conflicting reports about the length of time he could sit or stand—some indicating 10 to 15 minutes at a time and others indicating 30 minutes at a time—permitted the ALJ to "reasonably conclude[ ] that [the claimant] could sit for 30 minutes and stand for 15 minutes").

attention and concentration, and Drs. Liu and Ajtai reached similar conclusions. Only the ALJ imposed specific time frames on Elder's ability to stay on task.

At best, then, the ALJ's conclusion comes from whole cloth. At worst, the conclusion responds to the vocational expert's testimony that an off-task behavior restriction of six minutes per hour—that is, one more minute of off-task behavior per hour—"would be work preclusive." *Id.* at 79. If Elder can, in fact, concentrate for fifty-five minutes out of every sixty, that determination must come from medical evidence or opinions in the record, not the ALJ's "own surmise." *See Cosnyka*, 576 Fed. App'x at 46. So if the ALJ wishes to address the time that Elder can stay on task, she should recontact Elder's physicians to get their opinions on that issue.

For all these reasons, the case is remanded so that the ALJ can reconsider Elder's specific RFC limits after (1) appropriately applying the treating-physician rule and (2) further developing the record.

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 16, is DENIED, and Elder's cross motion for judgment on the pleadings, Docket Item 10, is GRANTED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this opinion.

SO ORDERED.

Dated: November 26, 2019
Buffalo, New York

 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE